AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Maryland

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| KEITH COREY JONES, a/k/a "Iddy" | ) ) ) ) ) | Case No.  1980  13-~~0459~~ TJS |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____May 9, 2013_____ in the county of _____ in the _____ District of _____Maryland_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sec. 841 | Distribution of controlled substances, to wit: heroin |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Craig Jester   T.F.O.
Printed name and title

Sworn to before me and signed in my presence.

Date:  08/22/2013  1:17 pm

_____
Judge's signature

City and state:  Baltimore, Maryland    Timothy J. Sullivan, United States Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

### I. AFFIANT AND EXPERTISE

Your Affiant, Craig Jester, after being duly sworn, states as follows:

1. I am an "investigative or law enforcement officer ... of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am a Detective with the Baltimore Police Department (BPD) and have been so employed since 2001. I have been deputized as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) for over two years. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During his time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed recorded conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users.

3. Through training, education and experience, I have become familiar with

1

the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

## II.  BACKGROUND

4.  In September 2012, DEA SIG began conducting an investigation of drug trafficking and violence associated with the Black Guerilla Family (BGF). Through the course of that investigation, Keith JONES, a/k/a "Iddy," was identified as member of the BGF. JONES was also identified as being the source of supply for the BGF "bubbles" operating in South Baltimore, specifically the "bubble" operating on Penrose Avenue, as well as customers outside of Baltimore City.

5.  Over the course of the investigation, agents have conducted extensive physical and electronic surveillance, made use of confidential informants, conducted car stops and made controlled purchases of narcotics. Investigators have also made use of the interception of wire and electronic communication of phones used by JONES. I have participated in this investigation and from my personal participation in this investigation, as well as reports made to me by other agents and officers of the BPD and other law enforcement authorities, I am familiar with the facts and circumstances of this investigation.

6.  As a result of this investigation, more fully described below, there is

2

probable cause to believe that JONES has distributed and possessed with the intent to distribute controlled substances violation of 21 U.S.C. § 841.

7. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint charging JONES with the above described federal offense, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on my review of the audio recordings. Because this investigation relied upon the interception of wire and electronic communication, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in brackets my "translation" of the words or terminology used. These interpretations, as well as my opinions contained herein, are based upon my training, experience and my knowledge of BGF and this particular DTO's operation.

### III. PROBABLE CAUSE

#### A. CONFIDENTIAL SOURCE INFORMATION

12. As part of this investigation, investigators interviewed a confidential source, herein referred to as CS-6, who is registered with the BPD and DEA. CS-6 has been a

member of the BGF for several years, and has been providing information to BPD for over a year and has made controlled purchased of narcotics, which has led to the seizure of drugs, money, and firearms. CS-6 is monetarily compensated for his/her information. CS-6's information has been corroborated to the extent possible and has been determined to be accurate and reliable.

13. CS-6 identified "bubbles" of the BGF members who were operating in neighborhoods in south and southwest Baltimore. Specifically, CS-6 identified the "bubble" operating in the area of Penrose Avenue in Baltimore City and the individuals involved in the operation of the "bubble." CS-6 related that the "bubbles" earned money for its members and the BGF through two primary means: selling narcotics and conducting robberies/home invasions.

14. CS-6 related that after the murder of Harry HICKS, then the prominent source of supply for the BGF in south Baltimore, the BGF "bubbles" in south Baltimore began obtaining their cocaine from a source of supply known to CS-6 as "Iddy." CS-6 identified a photograph of Keith Corey JONES as "Iddy." CS-6 further identified JONES as the source of supply for BGF members Robert TILLMAN, a/k/a "Dill," and Antonio DAVIS, a/k/a "Tank Top," both of the Penrose Avenue "bubble" in southwest Baltimore.

15. In January 2013, investigators again met with CS-6 regarding the criminal activities of JONES. At that time, CS-6 provided investigators with cellular telephone number 410-978-8150 (**TARGET TELEPHONE 8**). CS-6 also related that he/she had recently spoken to another BGF member about JONES and his (JONES) involvement in the distribution of narcotics. CS-6 related that during that conversation with the other BGF member, CS-6 was

told that JONES was "J,[1]" or a member of the BGF. CS-6 reportedly then questioned other BGF member about JONES's membership in BGF, and was told by other BGF members that JONES had been "J" longer than CS-6.

### B. CONTROLLED PURCHASES OF NARCOTICS

16. On April 18, 2013, JONES agreed to sell CS-6 a quantity of crack cocaine in a recorded telephone conversation. Later that day JONES met with CS-6 and CS-6 purchased two ounces of crack cocaine. The purchase was observed and audio recorded by investigators.

### ELECTRONIC SURVEILLANCE

17. On May 6, 2013, Judge Motz authorized the interception of wire and electronic communications for a period of 30 days occurring over cellular telephone assigned **(410) 622-5221 (TARGET TELEPHONE 11),** and new number used by JONES. On June 3, 2013, Judge Motz authorized the continued interception of **TARGET TELEPHONE 11** and that interception continued through July 3, 2013.

#### 1. Drug Transaction with Kenneth Reed – May 9, 2013

18. On May 9, 2013 at approximately 3:08 p.m., JONES, using **TARGET TELEPHONE 11** called 410-240-5673, a telephone subscribed to by Kenneth REED. The following is a portion of the transcript of that telephone conversation.

| | |
|---|---|
| Kenneth REED: | ...the girl called, I talked to the broad, I'm waiting for the bitch to call me then I came in. I ain't never go back out. Cause I ain't wanna. I already told you what I said far as um |
| Keith JONES: | I am waiting on you, whenever you ready just hit me and I'll come see you |

---

[1] The term "J" is short for Jamaa, a Swahili term meaning family. BGF members use the term to describe other members.

5

Kenneth REED:     Alright, you said one what for the uhh.

19. At approximately 3:36 p.m., REED called JONES and stated:

Kenneth REED:     Yo, the bitch just called, I'm getting ready to get up now.

Keith JONES:      (LAUGHING), Alright that's what's up. I'm waiting on you. I be at the barbershop by the time you finish, I be just getting out the barbershop. I just meet you down the way.

20. At approximately 4:28 p.m., with the help of electronic surveillance, law enforcement located JONES's vehicle, a black Jeep Cherokee bearing Maryland tag 9AR0425 parked and unoccupied on the Westside Shopping Center parking lot

21. At approximately 6:16 p.m., after a series of telephone calls and continual surveillance of JONES, law enforcement observed JONES as he drove to a Royal Farms store located at 1440 Key Highway in Baltimore, Maryland

22. At approximately 6:18 p.m., an older black Lexus bearing Maryland tag 4AY4733 entered the Royal Farms parking lot and parked. The vehicle was occupied by two black males - the driver, later identified as Kenneth REED, and the front seat passenger, later identified as William JOHNSON. REED parked his vehicle and walked toward JONES's Jeep Cherokee, while JOHNSON remained in the vehicle.

23. JONES exited his Jeep Cherokee and greeted REED in the parking lot. The two men talked briefly before walking toward the sore. As JONES and REED reached the front of the store, REED reach into his pants pocket and remove a large sum of money and handed it to JONES.

24. Both JONES and REED entered the store and walked into one of the aisles. JONES and REED then conducted what appeared to be a hand to hand drug transaction.

6

25. REED and JONES then separated and at approximately 6:24 p.m., JONES exited the store, and left the parking lot. Likewise, REED exited the store at approximately 6:30 p.m., re-entered the Lexus and left the parking lot.

26. At approximately 6:50 p.m., in the 2100 block of Hanover Street, law enforcement had REED's Lexus stopped for a non-functioning taillight. Upon approaching the vehicle, investigators noted that REED was acting in a very nervous manner. REED was observed fidgeting as if he was trying to conceal something underneath his right leg. REED was then asked to step out of the vehicle for officer safety. As REED exited the vehicle, investigators observed a clear plastic bag containing numerous empty blue zip lock baggies, lying on the seat where REED had been seated. Investigators knew, based on their training and experience, that these types of bags are often used to package drugs for street level distribution.

27. Once outside of the vehicle REED verbally consented to a search of his person as well as the vehicle. Law enforcement recovered from REED's front pants pocket one bag containing approximately 16.5 grams of heroin.

28. Based upon my training and experience coupled with the interception of wire and electronic communication, I believed that JONES distributed the heroin recovered from REED inside the Royal Farm stores in exchange for the money observed changing hands outside the store.

**2. Drug Transaction with Kenneth Reed – July 2, 2013**

29. On July 2, 2013, REED and JONES, using **TARGET TELEPHONE 11**, had several telephone conversations. The calls involved previous drug deals between the two.

Investigators learned that often REED would obtain drugs from JONES and then provide those drugs to an unidentified female.

30. On July 2, 2013, at approximately 7:24 p.m., JONES called REED. During the call JONES asked REED when he (REED) "saw [sold drug to]" the unidentified female customer. REED indicated that he "saw [sold drugs to]" the unidentified female right after JONES left for California. JONES asked REED if the unidentified female customer "grabbed both of them [quantities of heroin]" and REED replied yes. REED explained that the unidentified female customer "grabbed everything [all of REED's remaining heroin]" and he (REED) has not heard from her since. REED then told JONES, "I need to see you [meet to get more heroin]."

31. Based upon the context of the above call, I believed that JONES gave REED a quantity of heroin, and collected money from him (REED) prior to leaving for California. I believed that a portion of that heroin was given to the unidentified female customer, and a portion of the money[2] provided to JONES by REED was from the same female. REED then explained that the unidentified female customer purchased his (REED's) remaining heroin "grabbed everything [all of REED's remaining heroin]"), and REED was waiting for JONES to return from California to purchase more heroin ("I need to see you [meet to get more heroin].").

32. On July 2, 2013, at approximately 8:28 p.m., JONES called REED. During that call, REED asked JONES to "step it up a little bit [hurry up to meet sooner]." JONES in turn asked REED if it's "like that out there [customers waiting for more heroin]" and

---

[2] During some of the other conversation between JONES and REED on July 2, 2013, JONES complained that one of the bills provided by the unknown female was counterfeit. According to JONES, the bank caught the counterfeit bill, which caused problems for "Leah," who was depositing the money. "Leah" is believed to be Deleal Jones, JONES's wife, and registered owner of one of the vehicle used by JONES.

8

REED replied yes. REED then told JONES that he (REED) had to "holla at my man [customer]." REED also told JONES he (REED) got the money for "one of them joints [one gram of heroin]" and that he (REED) still needed "my three [three grams of heroin]." After JONES agreed, REED told JONES that he (REED) was waiting on JONES.

33. Based on the context of this call, I believed that REED wanted to meet JONES as soon as possible because he (REED) had customers waiting to purchase heroin. REED also told JONES that he (REED) picked up ninety dollars from an associate in Cherry Hill and that he (REED) still wanted to purchase three grams of heroin for himself (REED).

34. On July 2, 2013, at approximately 10:06 p.m., REED called JONES. During the call REED reiterated that he (REED) was waiting for JONES, and JONES replied that he (JONES) knew. JONES then confirmed that REED needed "the three [three grams of heroin]," and told REED that he (JONES) would try to get to him (REED) that night. REED then reminded JONES that he (REED) really needed "four [four grams of heroin]." JONES ended the call after telling REED that he (JONES) would call REED after finishing in Washington D.C.

35. At approximately 10:16 p.m., REED called JONES. During the call REED told JONES that "the broad [the unidentified female customer]" had just called and that the "money is built up [collected money owed to JONES]." JONES told REED that he (JONES) was going to try and meet with REED.

36. At approximately 10:55 p.m., JONES called REED. During that call JONES asked REED where he (REED) was, and REED related that he (REED) was in Federal Hill waiting for him (JONES). JONES indicated that he (JONES) would try to be there in

twenty minutes. JONES then told REED to meet where "we park the truck at."

37. Based on the context of this call, I believed that JONES was going to meet REED in the 100 block of West Henrietta Street in Baltimore. This location is within one block of JONES mother's house, 908 Bevan Street. Additionally, investigators knew, through the use of electronic surveillance, that JONES left Hyattsville, Maryland and was traveling north toward Baltimore City.

38. At approximately 11:18 p.m., JONES received a text message from REED's phone. That message read "Im here." At approximately the same time, law enforcement units arrived at intersection of the 100 block of West Henrietta and Leadenhall Streets. Upon entering the area, law enforcement observed REED's black Lexus parked on Leadenhall Street near Henrietta Street.

39. At approximately 11:26 p.m. surveillance units observed a white Jeep Wrangler, enter the area and park behind the Lexus. REED and JONES were then observed talking with each other outside of their vehicle. At approximately 11:35 p.m., JONES and REED re-entered their vehicles, and left the area. REED was followed onto Light Street, where a marked patrol vehicle was requested to assist with a traffic stop.

40. REED's vehicle was stopped in the 400 block of Light Street. Upon approaching the vehicle, REED appeared nervous and was asked to exit the vehicle. A canine unit responded and conducted an exterior scan of the vehicle, and reacted for the presence of narcotic on the driver's side front door. A search was conducted of the vehicle and a paper towel was recovered from inside the vehicle. The towel contained a clear plastic baggie, which contained approximately 18.7 grams, which was concealed behind the center hub of the driver's

side rear tire.

41. Based upon my training and experience coupled with the interception of wire and electronic communication, I believed that JONES distributed the heroin recovered from REED.

## IV. CONCLUSION

42. Based upon the foregoing, I respectfully submit that there is probable cause to believe that Keith Jones, a/k/a "Iddy" did, on May 9, 2013, distribute a quantity of heroin, in violation of 21 U.S.C. 841.

_____
TFO Craig Jester
Drug Enforcement Administration

Sworn to before me this 22nd day of August, 2013.

_____
Timothy J. Sullivan
UNITED STATES MAGISTRATE JUDGE